Callahan, J.
This action in ejectment involves a dispute over the right to possess and use certain church property known as Saint Nicholas Cathedral of the Russian Orthodox Church located on Bast 97th Street in the city of New York. The dispute has its origin in a break or schism within that church following the Bolshevik revolution in 1918.
Prior to that time the Russian Orthodox Church was a worldwide religious denomination which had existed for 900 years with its headquarters in Russia. It has also variously been known as the Christian Orthodox Catholic Church of the Eastern Confession and the Christian Orthodox Greek Catholic Church.
The adherents of this faith spread to the United States about a century ago and eventually parishes were established in the city of New York.
In 1903, the Saint Nicholas Cathedral was erected with money furnished by the central church authorities in Russia. It was to be used as the Episcopal See of the Diocese of North America. Title to the property was taken by Russian Orthodox Saint Nicholas Church in New York, a corporation organized under the Religious Corporations Law. Under its charter this corporation was to be controlled by two trustees who were to be the Russian Ambassador and the Russian Consul General to the United States.
The Russian Orthodox Church was a centrally organized one and the archbishops or metropolitans who occupied the cathedral prior to 1918, were appointed pursuant to canon law by the controlling church authorities in Moscow and were answerable only to such authorities.
Historically the head of the Russian Orthodox Church was the Patriarch but from the time of Peter the Great to the *312 Kerensky rebellion the czars had forbidden the calling of any “ Sobor ” which was the traditional convention of church delegates authorized to elect a Patriarch. As a result during this long period no Patriarch had held office and the church was governed by the Holy Synod, a member of which was the Chief Procurator, who was the representative of the czars.
In 1917, the Kerensky government permitted a sobor to be called in Russia. It elected one Tikhon as Patriarch. A year or two later the Bolshevik revolution occurred. Religion was proscribed and Tikhon was imprisoned.
As a sequence to the antagonism of the Soviet government to religion and its persecution of church dignitaries, many of the American adherents of the church decided to separate from the mother church administratively though adhering to it spiritually. In 1924, they held an American “ Sobor ” in Detroit and selected one Platon Rojdesvensky as American archbishop or metropolitan. The asserted authority for the holding of this American diocesan sobor was a certain ukase — issued by Tikhon from his prison, but this decree by its terms would seem to be limited to dioceses in Russia. In any event the right of local self-government was clearly a temporary measure effective only until the central church was restored.
In the meantime in 1923, another “ Sobor ” had been permitted to be called in Russia. It selected a “ locum tenens ” or temporary head of the central church. There has always been some dispute among churchmen as to canonical validity of this sobor. About 1924, one Kedrovsky appeared in New York claiming to be the metropolitan appointed by the central church authorities. Litigation was commenced in 1925, between the forces of Platon and those of Kedrovsky over the right to possess the cathedral which eventually reached this court and the Court of Appeals (Kedrovsky v. Rojdesvensky, 214 App. Div. 483, affd. 242 N. Y. 547).
Although Special Term ruled in that case in favor of Rojdesvensky and the American group this court reversed that decision and gave judgment in favor of Kedrovsky and the central church enjoining Platon Rojdesvensky from occupying the cathedral and that judgment was affirmed by the Court of Appeals. In that action both sides had claimed that the respective archbishops supported by them had been appointed by the central church authorities. Rojdesvensky claimed an oral designation by Patriarch Tikhon and Kedrovsky claimed to have a written appointment signed by that Patriarch and also *313 that his appointment was approved by the church dignitaries elected in the sobor held in 1923. The canonical validity of that sobor was one of the issues litigated in the former suit. This court upheld its validity at least as a de facto “ Sobor ” or convention. However, the parties to the present litigation all contend that the 1923 sobor was not canonically valid because, among other reasons, it was not universal or world-wide in character. We do not see that this question of validity of the 1923 sobor alters the weight to be given to the earlier decision. The principle that controlled that decision was that the right to appoint the American archbishop was vested in the central church authorities.
After the decision in the earlier case by Special Term and before it was reversed by this court, a special act was adopted by the Legislature (L. 1925, ch. 463) incorporating plaintiff. This act provided that Russian Orthodox Saint Nicholas Church in New York might convey the cathedral property to plaintiff which was controlled by Platon Rojdesvensky and his followers in the American church. Thereafter a deed was executed purporting to convey the cathedral property from the old corporation to the new, but this deed was executed by only one of the two trustees. One of the issues presented in this case concerned the validity of that deed. We find, however, that it is unnecessary to discuss that issue as the question of legal title is not controlling.
For twenty years or more after the prior litigation Kedrovsky and his successors continued to occupy the cathedral on behalf of the mother church. In 1927, the Soviet government had permitted the Russian Orthodox Church to resume activities, but under a pledge of loyalty to the Soviet regime. In referring to this church as it existed from 1918 to 1927, the parties designated it the “ Renovated ” church as distinguished from the “ Patriarchal ” church.
In 1945, another sobor was held in Russia. It was world-wide in character and some delegates from the separated American group attempted to attend it. They did not reach Moscow in time, apparently due to interference by Soviet civil officials. But, a new Patriarch, one Alexi was elected by this sobor, and the American church now recognizes him as the spiritual head of the Russian Orthodox Church. The American church on several occasions since 1945, has petitioned the Patriarch to reunite the two churches but has insisted on the right of the American church to elect its own archbishop. Up to the time *314 of trial of tins action, efforts to effect reunion continued but the churches have never been able to agree on the question of autonomy, the authorities of the central church insisting on their right, under canonical law, to appoint the American archbishop. It appears that in number the adherents of the American group or church largely exceed those in this country continuing to be connected to the Moscow patriarchate, but in a church that is centrally organized the matter of numbers is not controlling on questions of church procedure (Watson v. Jones, 80 U. S. 679; Zollmann on American Civil Church Law [Columbia University, 1917], pp. 178-185, 190-193, 197).
After Platon Rojdesvensky's death in 1934, one Theophilus was elected American archbishop by an American convention. Defendant Benjamin Fedchenkoff succeeded Kedrovsky upon the latter's death, having been appointed American archbishop by the central authorities of the church in 1934. His appointment has since been ratified and confirmed by Patriarch Alexi. These two dignitaries are the controlling archbishops involved in the present action which was commenced a day before certain legislation affecting the issues was enacted in New York in 1945 (L. 1945, ch. 693).
The present action took the form of a suit in ejectment and the parties discuss in the briefs the question of whether such a suit will lie and whether it is barred by the Statute of Limitations, but we feel that it is necessary to discuss only the principal issue as to whether, as contended by plaintiff, the archbishop selected by an American convention or, as contended by defendant, the one appointed by the central church authorities in Russia had the right to the use of the cathedral.
Special Term decided the issues in the present case in favor of defendants, representing the central church, thus following the principle enunciated in Kedrovsky v. Rojdesvensky (supra). It held that the 1945 statute did not lend any support to plaintiff's claim of its right to possess the cathedral. It applied the rule of common law that whenever a part of a centrally organized church breaks away to form a new society the temporalities are to be administered according to the rules of the ecclesiastical body to which the church corporation is subject (Westminster Church v. Presbytery of New York, 211 N. Y. 214), and the further rule of common law that in a centrally organized church whenever questions of discipline or ecclesiastical rule have been decided by the highest church tribunal within the church, the civil courts will treat that ruling as controlling (Watson v. Jones, supra; Baxter v. McDonnell, 155 N. Y. 88).
*315 The principal if not the sole contention advanced by plaintiff-appellant on this appeal is that Special Term misconstrued the 1945 statute. Before discussing that question we must note that after the decision by Special Term the 1945 statute was amended by chapter 711 of the Laws of 1948. We will assume upon this appeal that plaintiff is entitled to the benefit of the law in its amended form (see Gilpin v. Mutual Life Ins. Co., 299 N. Y. 253).
These two statutes added a new article 5-C to the Religious Corporations Law, the general purpose of which was to define the Russian Church in America and to provide a procedure for the incorporation of churches to be affiliated with it.
Plaintiff points to several provisions in article 5-C which it contends indicate that the purpose of the Legislature was to declare that the American church has the right of autonomy in its relations with the Russian Orthodox Church. It contends that this statute warrants a judgment in its favor awarding it possession of St. Nicholas Cathedral.
First, plaintiff points to the provisions of section 105 of article 5-C of the Religious Corporations Law reading: “ The ‘ Russian Church in America ’, as that term is used anywhere in this article, refers to that group of churches, cathedrals, chapels, congregation, societies, parishes, committees and other religious organizations of the Eastern Confession (Eastern Orthodox or Greek Catholic Church) which were known as * * * (d) Russian Orthodox Greek Catholic Church of North America since in or about nineteen hundred twenty-four; and were subject to the administrative jurisdiction of the Most Sacred Governing Synod in Moscow until in or about nineteen hundred'seventeen, later the Patriarchate of Moscow, but now constitute an administratively autonomous metropolitan district created pursuant to resolutions adopted at a general convention (sobor) of said district held at Detroit, Michigan, on or about or between April second to fourth, nineteen hundred twenty-four.”
It contends that this constituted a declaration by the Legislature of this State that the American church was entitled to autonomy in its relations with the central church.
While this definitive section is far from a model of clarity, we find nothing in it to support the claim of plaintiff that the Legislature intended to determine the issue of ecclesiastical autonomy existing between the two branches of the church. The clause found in the definition is merely descriptive in its his *316 torical reference to the administrative autonomy of the “ Russian Church in America ”. Section 105 proceeds through subdivisions “a ”, “ b ” and “a” to refer to the groups constituting the earlier American church by reciting historical events connected with the development of the church in America, first as the American mission of the central church and then the American diocese of said church. In referring to the separation of the American church from the church in Moscow in 1924, subdivision “ d ” recites the historical events connected with that separation and refers to the purport of certain resolutions adopted at the Detroit convention for the autonomous status of the separated church. It does not purport, according to our construction, to set forth any legislative finding determining the ecclesiastical dispute as to the right of autonomy. At most it amounts merely to a legislative recognition of the fact that the American branch or “ Metropolitan District ” asserted its independence in administrative affairs in this country. It should not be construed to mean that the Legislature has taken sides in the religious controversy as to the right of autonomy, involving the right to appoint or elect archbishops dependent as it is on the canon law of the church. Such a construction would show an intent by the Legislature to interfere in ecclesiastical concerns which is hardly within the competence of legislative action (U. S. Const., 1st Amendt.; N. Y. Const., art. I, § 3), and certainly would be a departure from the traditional American principle of separation of church and State. As was said in McCollum v. Board of Education (333 U. S. 203, 212), in discussing the first amendment of the Federal Constitution: “ For the First Amendment rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere.”
Plaintiff then points to the provisions of section 107 of article 5-C claiming that they indicate a legislative intention to grant jurisdiction or authority to the American church over every Russian orthodox church in the State, even those established prior to the creation of the 1 ‘ Metropolitan District ’ ’ and never affiliated with the new group and to grant control to the American church over property of churches adhering to the ecclesiastical statutes or rules of the central Russian Orthodox Church in Russia.
The provisions of section 107 that every Russian orthodox church incorporated before or after the creation of' the autono *317 mous e< Metropolitan District ” shall recognize and be subject to the jurisdiction of the governing authorities of the 1 ‘ Russian Church in America ’ ’ must be read in the light of the definition of the “ Russian Church in America ” as set forth in section 105. In other words, it appears to us that it was intended to mean that any church heretofore or hereafter incorporated for the purpose of adhering to the American church must be subordinate to the rules and the decisions of the authorities of the governing bodies of that church. Surely it was not intended to mean that Russian orthodox churches formed for the purpose of adhering to the Moscow Patriarchate must be subordinate to the American church.
The control given trustees of the temporalities of the Russian Orthodox Church in subdivision 3 of section 107 must be likewise limited. This subdivision does not purport to grant control to the ‘ ‘ Russian Orthodox Church in America ’ ’ to St. Nicholas Cathedral or any other property of the mother church. The general scope and purpose of the Religious Corporations Law is to authorize the creation of religious corporations as secular agencies to aid in the conduct of church business and affairs, including the acquisition, holding and disposal of property (Walker Memorial Baptist Church v. Saunders, 285 N. Y. 462). But the State attempts no interference with the practices and rules of any spiritual body in the matter of its temporalities. We find no departure from this general policy in the provisions of article 5-0. Subdivision 3 of section 107 simply provides that the trustees of a Russian orthodox church (meaning Russian Orthodox Church in America) shall administer its own temporalities in accordance with the rules of the “ Metropolitan District ”. We can find no suggestion in the present article of any intention to transfer any beneficial interest of a religious trust in the St. Nicholas Cathedral to the “ Russian Orthodox Church in America ” contrary to the wishes of the supreme ecclesiastical authority of the beneficiary church.
That the Legislature did not intend by these statutes to strip the Russian or central branch of the church of its property in New York is further evidenced by the fact that in other sections of the Religious Corporations Law the Legislature has recognized the mother church in Russia as a living ecclesiastical body and has granted the Moscow Patriarchate certain powers with respect to church affairs (see Religious Corporations Law, § 15, subd. 3; art. 15, as added by L. 1943, ch. 145). That these separate provisions with respect to the Moscow Patriarchate *318 and the Rnssion Church in America are concurrently carried in the same statute indicates a legislative recognition of two separate and independent churches to both of which the Legislature has granted the right to incorporate churches, conduct their own affairs and hold their own temporalities.
This brings us to consider the views expressed by our dissenting brethren. First, they disagree with our construction of article 5-C of the Religious Corporations Law, construing it, as does the plaintiff, to contain a grant of autonomy and a declaration in effect that the American church is entitled to the temporalities of all Russian orthodox churches in this State. We have already dealt with this subject. Then they have taken a position which we find that plaintiff does not contend for, which is in effect that the Russian Orthodox Church in Russia is not a true church but a mere instrumentality of the Russian government, made so by the subservience of the high church authorities to that government and that therefore the American church is the only true Russian Orthodox Church and has the right to possess the cathedral. In support of this theory the dissenting opinion proceeds with great vigor to attack communism, the prevailing political creed in Russia today, as atheistic and the Soviet government as a totalitarian despotism, and concludes that in fact no real religious activity would be or is permitted in Russia. They arrive at the determination that the present Russian Orthodox Church is not a real, but merely a sham or phantom, church deprived of all power of action in respect to its followers and property in America by duress imposed by the Soviet state.
The dissenting opinion sets forth at considerable length the antireligious ideologies of communism, points out and condemns the totalitarian rule of the Soviet state and then com eludes that any church that has pledged loyalty to such a government is not a true religious organization. The conclusion drawn is that a judicial finding is warranted that there is no restored Russian Orthodox Church in Russia today. We concur entirely with the views of our brethren attacking communism. We yield nothing to them in their condemnation of the lack of religious freedom in Soviet Russia, but we disagree with the conclusion drawn as to the nonexistence of the Russian Orthodox Church in Russia, because we believe that we may not draw that conclusion on this record, even if we might desire to do so.
We are dealing with a judicial action and we do not act on suspicion or news reports; we act solely on legal proof. We *319 must consider the contentions of the parties and the proof they have chosen to submit except as to matters concerning which we may take judicial notice. Here, both parties have taken the position that the Russian Orthodox Church is presently restored in Russia. Plaintiff introduced proof that since the last World War greater rights have been afforded to the Russian Orthodox Church in Russia. Its witnesses recognized the 1945 sobor as authentic and as restoring the Moscow Patriarchate and accepted the restoration of the traditional church as a fact. Plaintiff makes no suggestion that the restored church is a new or different church, a mere state agency, as suggested in the dissenting opinion. Plaintiff and the American Russian church it represents choose to treat the Patriarchate Alexi as a holy man, a church leader and the Holy Synod as an existing hierarchy. The American church has repeatedly petitioned the Russian church authorities to reunite the American church to the mother church. Right down to the time of trial of this action, negotiations were proceeding for this reapproachment. The fact that the mother church was required to pledge loyalty to the Soviet civil regime and had agreed not to attack communism from the pulpit was apparently considered no obstacle to reunion. The only factor causing cleavage seems to be the insistence of the American church on its right to elect its own archbishop and the refusal of the mother church to yield that right unless at least the power of veto of any selectee was reserved to the high church authorities.
The plaintiff and the American church that it represents do take the position, as we understand it, that the “ Renovated ” church was noncanonical. But we are dealing with the church since 1945. Plaintiff recognizes the domination of the Soviet civil authorities over the present church and deplores its pledge of loyalty to the Soviet regime but concedes nevertheless that the old Russian Orthodox Church has authentically been restored at least since the 1945 sobor and is presently an existing though subjugated church. Perhaps this belief is fostered in whole or in part by religious convictions instilled by á faith that has been accustomed to look up to a mother church in Russia for the past 900 years. Plaintiff and those it represents certainly have the right to decide whether or not to believe in the existence of a true church and the genuine spiritual qualifications of its hierarchy. That judges may suspect that the parties have a wrong conception of what is going on in the church in Russia today is wholly immaterial. The *320 parties have been in direct consultation with the representatives of the church in Russia. Whether these church heads are truly religious men trying to keep the faith alive and to serve the religious needs of their people of Russia to the best of their ability or whether they are willing and servile tools of an anti-religious government is not to be decided by this court adversely to the contentions of the parties on any theory that we may take judicial notice of actual conditions behind the “ iron curtain ” in Russia today. Such matters are not so notorious as to be subject to the rule of judicial notice.
When we accept the attitude of the parties as to the existence of a restored Russian Orthodox Church in Russia today, the issue presented in this case becomes a simple one and the rule of law controlling its decision is plain. The law requires us- to hold that the decision of the church judicatories on the question of whether bishops must be appointed or may be elected must be controlling on us, and the right to use the cathedral would rest in the archbishop selected by those judicatories.
While the importance of this decision cannot be gainsaid, we are unable to agree with our dissenting brethren as to its scope or effect. It involves no question of the denial of religious freedom to any group nor is any group being ousted from its place of accustomed worship. The forces behind the plaintiff in this case have not been in possession of Saint Nicholas Cathedral since the decision in the Kedrovsky case (supra) almost a quarter of a century ago. The present determination does not reach beyond the right to use and control a single church property built and maintained with funds supplied by the mother church in Russia. This decision is at least partly controlled by New York statute law which can have no extraterritorial effect. If and when it should appear that the Russian Orthodox Church is no longer existent in Russia or if and when the Legislature of this State may make appropriate disposition of property within this State found to be subject to its control and disposition, our courts may take other action. Thus far we find no declaration by the Legislature and no proof offered to this court that the trust purposes for which plaintiff holds the cathedral have been extinguished or terminated.
Meanwhile plaintiff holds at least the nominal legal title to the property involved. For as long as it may continue to do so the plaintiff remains in a position to protect whatever claims the American church may have to the cathedral.
*321 Accordingly, we have reached the conclusion that the defendant is entitled to prevail.
The judgment appealed from should be affirmed.